IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

GARY ALAN GLASS,             *

    Plaintiff,               *

      v.                     *      CIVIL NO.: WDQ-12-1901

ANNE ARUNDEL COUNTY,         *
    *et al.*,                  *

    Defendants.              *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Gary Alan Glass sued Anne Arundel County (the "County") and several police officers[1] for constitutional violations under 42 U.S.C. § 1983. ECF No. 1. Pending are defendant Corporal Mark Collier's motion for summary judgment, ECF No. 42, and Glass's motions to strike various exhibits, ECF Nos. 47-49. No hearing is necessary. Local Rule 105.6 (D. Md. 2011). For the following reasons, the motion for summary judgment will be granted in part and denied in part, the motions to strike affidavits will be denied, and the motion to strike the

---

[1] Glass sued individually and in their official capacities: Mark Collier, James E. Teare, Sr., James Scott Davis, Christine Ryder, Brenda Fraser, John Gilmer, and Unknown County Employee X. ECF No. 1. On March 14, 2013, the Court granted the motion to dismiss filed by Davis, Gilmer, Ryder, and Fraser, dismissing counts three, five, and six. ECF No. 22. The same day, the Court also bifurcated the case and stayed the claims against the County pending resolution of Glass's claims against Collier and Employee X. *Id.*

defendant's expert report will be granted in part and denied in
part.

I. Background[2]

    A. The Traffic Stop

        1. Glass's Version of Events

At about 8:15 a.m. on September 14, 2010, Glass was driving
at 30 miles per hour westbound on Rutland Road in Davidsonville,
Maryland. *See* ECF Nos. 50-1 at 14, 50-3 at 4-6.  At the same
time, Collier--an off-duty County Police Officer--was driving
out of the parking lot of a pediatrician's office located
further west down Rutland Road. *See* ECF No. 50-1 at 15-16, 24,
32.  Collier was in an unmarked 2005 Ford Escape sport utility
vehicle ("SUV") with "heavily tinted" windows; his two children
were in the backseat. *See* ECF Nos. 50-1 at 18, 50-2 at 26, 31-
32, 50-14 at 2.

Glass first saw the SUV in the driveway of the
pediatrician's office when he was 250 yards east of the
driveway, while he was driving around a blind curve in Rutland
Road. *See* ECF No. 50-1 at 5-6, 10-11, 15.  When Glass was about
100 to 125 feet from the driveway, the SUV pulled out into the
right traffic lane directly in front of Glass. *See* ECF Nos. 42-

_____

[2] The facts are taken from the parties' summary judgment briefs
and exhibits.  ECF Nos. 42, 50, 51.  In reviewing a motion for
summary judgment, the nonmovant's evidence "is to be believed,
and all justifiable inferences are to be drawn in his favor."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

5 at 6, 50-1 at 8, 10-11, 50-3 at 6.  Glass slammed on his
brakes--so hard that the anti-lock braking system started--and
narrowly avoided hitting the SUV.  *See* ECF Nos. 50-1 at 16-17,
50-10 at 2.  Glass also blew his horn to alert the SUV's driver
that he was behind the SUV and about to hit it.  *See* ECF No. 50-
1 at 6, 19.  During his emergency braking, Glass's car came
within six to ten feet from the SUV and then backed away as
Glass decelerated and the SUV accelerated.  *See id*. at 18-21.

About 50 yards ahead, the SUV pulled into the right turn
lane before the intersection of Rutlandview Road and stopped.
*See* ECF Nos. 42-3 at 1, 42-5 at 6, 50-1 at 20-21.  Glass
continued driving westbound.  *See* ECF No. 42-5 at 6.

After Glass had driven about 300 yards further, he noticed
the SUV behind him with blue lights flashing in the windshield.
*See* ECF No. 50-3 at 6-7.  Glass pulled over, and the SUV pulled
over behind him.  *See* ECF No. 42-5 at 6-7.  Glass got out of the
car and stood with his hand on the driver's side door.  *See* ECF
No. 50-1 at 23-24.  As he did, Collier--wearing a t-shirt, white
gym shorts, and tennis shoes--got out of the SUV and ordered
Glass to get back into his car.  *See* ECF No. 42-5 at 7.  Glass
complied.  *See id*.  Collier then "walked fast" or "ran up" to
Glass's car, "yelling and screaming at [him] for blowing [his]
horn . . . and [asking if he knew] that there were laws against

blowing your horn."[3]   *Id.*   Collier was "absolutely out of
control."   ECF No. 50-1 at 23.   As he walked to Glass's window,
Collier lifted his t-shirt to display a holstered gun, but he
did not identify himself as a police officer.   *See id.* at 26,
46.

When Glass explained that he had sounded the horn because
of Collier's failure to yield, Collier said: "Oh that's not
true. . . .   There was plenty -- you were way back.   There was
plenty of distance."   *See* ECF Nos. 42-5 at 8, 50-1 at 30.
Collier then requested Glass's license and registration, which
Glass handed to him.[4]   *See id.*   Glass offered his insurance card,
but Collier declined, which made Glass even more concerned that
Collier was not actually a police officer.   *See* ECF Nos. 42-5 at
8-9, 50-1 at 30-31.

As Collier turned and walked back to his SUV, Glass called
911.   *See* ECF No. 50-1 at 31.   He told the operator that he had

---

[3] Glass could understand what Collier was saying, even though
Collier was screaming.   *See* ECF No. 50-1 at 25-26.

[4] The computer aided dispatch ("CAD") system records indicate
that Collier called in the stop at 8:19 a.m.   *See* ECF Nos. 42-2
at 3, 42-7 at 5.   At 8:28 a.m., the records state "CLEAR WITH
DATA SHEET."   ECF No. 42-7 at 5.   Martha Thames--a 911
dispatcher--and Collier aver that the records show that the stop
ended at that time.   *See* ECF Nos. 42-2 at 3, 42-7 at 1-2.
However, the records state that the "incident closed" eight
minutes later at 8:36 a.m.   ECF No. 42-7 at 5.   Corporal Alfred
Thomas Barcenas testified that--"as state[d] in the CAD notes,"
the stop lasted "[m]aybe sixteen, eighteen minutes."   ECF No.
50-7 at 10.

been pulled over by a car with blue lights and asked if the driver was a police officer. *See id*. at 32.  The operator eventually confirmed that Collier was a police officer but incorrectly told Glass that Collier was an officer named "VanDyke." *See id*. at 32-33, 45.  Glass asked if a police supervisor could respond to the traffic stop, but Hubberard--a supervisor at the 911 call center--denied the request. *See id*. at 33; ECF No. 42-5 at 50-51.  Glass then requested that Hubberard ask Collier if they could move the cars to a safer location.[5]  *See* ECF No. 50-1 at 34.  Hubberard also denied that request. *See id*.

While Glass was on the phone with 911, Collier took Glass's license and registration to the SUV. *See id*. at 30.  Collier heard the radio dispatcher requesting other cars to respond to the traffic stop. *See* ECF No. 50-2 at 45.  Collier radioed and said that he did not need assistance and nearby cars should disregard the dispatcher's request. *See id*.  The dispatcher told Collier that Sergeant Gilmer had requested additional cars, so Collier called Gilmer on his cell phone. *See id*. at 45-46. Gilmer informed Collier that he was sending additional cars

---

[5] Glass's car was parked directly in front of another blind curve on a shoulder-less, two-lane road. *See* ECF No. 50-13 at 2. Glass was concerned about an accident if a westbound car went around his car and Collier's SUV by entering the left lane as an eastbound car came around the blind curve. *See* ECF No. 50-1 at 33-34.

because Glass had called 911 and was upset. *See id*. at 48.   He

was concerned that Glass would not give Collier his license,

because "by law you're not required to give your license to an

individual . . . that is in civilian clothes." ECF No. 50-12 at

13.   Collier told Gilmer that he had planned to write Glass a

warning, but since Glass had called in and complained, he would

issue Glass a ticket. *See* ECF No. 50-2 at 49, 51.

Collier returned to Glass's car, told Glass that he was a

County police officer and "shoved" an identification card "in

[Glass's] face so [he] couldn't even read it." *See* ECF No. 50-1

at 44-45.   Collier did not tell Glass his name. *See id*. at 45.

Collier then handed Glass a citation for following too closely,

in violation of Md. Code Ann., Transp. § 21-310. *See* ECF Nos.

42-2 at 3, 42-5 at 11, 50-14 at 3.   Glass told Collier that he

would dispute the ticket in court and "hoped" that Collier would

attend. *See* ECF No. 50-1 at 39.   Collier put his head closer to

Glass's car window and asked if Glass was threatening him. *See*

*id*.   Glass responded that he was not and drove away after

Collier told him that he could leave. *See id*. at 39, 43.

Glass estimated that the stop lasted between 20 and 30

minutes, longer than the time reflected in the CAD records.[6] *See*

---

[6] Glass was on the phone with 911 for almost 14 minutes. *See* ECF
No. 50-10 at 4.   He asserts that he was detained for several
minutes before he called 911 and for a few minutes after. *See*
*id*. at 7.

6

ECF Nos. 50-1 at 46-47, 50-10 at 7.  Collier did not remember when he called in the stop.  *See* ECF No. 50-2 at 40.

After the traffic stop, Glass called the police station and spoke to several officers about Collier's behavior.  *See* ECF No. 50-10 at 5-6.  The next day, he spoke to officers in Internal Affairs about the incident.  *See id.*  On October 12, 2010--after Glass wrote a letter complaining about the incident to the Chief of Police--Barcenas, who worked in Internal Affairs, conducted a recorded interview about the stop with Glass.  *See* ECF Nos. 42-5 at 1, 4, 38; 50-13.

### 2. Collier's Version of Events

Collier's version of the events before the stop, and his interactions with Glass during the stop, is markedly different from Glass's.

Collier states that he first looked left before turning out of the driveway, but he did not see any cars.  *See* ECF No. 42-2 at 2.  Then, as he was pulling out of the driveway and "accelerating into the lane of travel," he "noticed [Glass's car] out of [his] peripheral vision start to come over a hill." *See id.*; ECF No. 50-2 at 21-22.  Collier did not brake but continued to accelerate into his right hand turn.[7]  *See* ECF No. 50-2 at 23-24.  Glass drove to within six to nine feet of

---

[7] Collier asserted that he felt that he made this turn "in a safe manner."  *See* ECF No. 50-14 at 5.

Collier's car; Collier could see in his rearview mirror that Glass was upset and shaking his head. *See id*. at 29.  Glass continued to follow six to nine feet behind Collier's car for the next 50 to 75 yards. *See id*. at 30.  Glass then blew his horn for three seconds. *See id*. at 33-34.

Collier turned on his lights and stopped his car. *See ECF Nos.* 50-2 at 34, 39; 50-14 at 3.  Collier left the SUV and told Glass to drive around--and pull over in front of--the SUV, which Glass did. *See ECF Nos.* 50-2 at 34-35, 39; 50-14 at 3.  Collier ordered Glass to get back into his car; Collier then returned to his own car and placed it at a 45 degree angle into the roadway, "so if people were coming down the road, they would hit my car instead of his."[8]  *See ECF No.* 50-2 at 34-36.

As Collier approached the car, he lifted his shirt to make sure his holstered gun was readily accessible during the stop.[9] *See ECF No.* 50-2 at 43-44.  He identified himself by name, and as a police officer, to Glass and asked for his license and registration. *See ECF Nos.* 50-2 at 44, 50-6 at 9.

---

[8] Collier acknowledged that this "maneuver is meant to absorb the impact with the car" from traffic approaching from the rear, and that his two children were in the backseat of the SUV. *See ECF No.* 50-2 at 37.

[9] Collier was concerned about his safety, because he felt that Glass was acting aggressively when he got out of his car at the beginning of the stop. *See ECF No.* 50-2 at 41.  He also noted that "[e]very car [he] stop[s] could have a gun in the car." *Id.* at 43.

Some time during or soon after the stop, Collier wrote notes on the back of a copy of the citation briefly describing his version of the events before the traffic stop.  *See* ECF Nos. 42-4 at 4; 50-5; 50-16 at 4-5.  Later, he also typed on his computer more notes about the stop.  *See* ECF Nos. 42-4 at 4, 50-6 at 10-11.

### 3. Expert Report

On July 17, 2013, Corporal Gregory Russell--an asserted expert in accident reconstruction--completed a report analyzing the events of the traffic stop.[10]  *See* ECF No. 42-3 at 1.  The report calculates, *inter alia*, the time and distance required for Glass to brake and avoid hitting Collier, and the time and distance required for Collier to complete the turn and accelerate away from Glass.  *See id*. at 2-4.  The report concludes that--based on Russell's calculations and the alleged statements of both parties--Glass did not need to take any "evasive maneuver[s]" to avoid hitting Collier and that Glass followed Collier "too closely" for at least 100 feet, which "justified enforcement action."  *See* ECF No. 42-3 at 3, 5-6.

### B. The Traffic Case

On November 1, 2011, the District Court for Anne Arundel

---

[10] The report states that it relies on statements "from Mr. Glass and Cpl. Collier, [site] visits to the scene of the incident, [Russell's] expertise and known data," and "scene photographs and measurements" taken by Barcenas and Corporal Douglas Branagan.  ECF No. 42-3 at 1-2.

County held a trial on Glass's traffic citation. *See* ECF No.

50-3 at 1.[11]  Collier,[12] Gilmer, and Glass testified. *Id.* at 2.

During his cross-examination of Collier, Glass's counsel

questioned Collier about--and introduced as evidence--Collier's

hand-written notes on the copy of the citation and typed notes[13]

about the incident. *See* ECF No. 42-4 at 4, 6.  Glass was

acquitted. ECF No. 42-1 at 8.

    C. Procedural History

    On June 26, 2012, Glass sued the defendants for civil

rights violations under 42 U.S.C. §§ 1983, 1985, and 1986.  ECF

No. 1 ¶ 1.[14]  On March 14, 2013, the Court dismissed counts

---

[11] *State v. Glass*, Citation No. 0FY86315 (Dist. Ct. for Anne
Arundel Cnty).

[12] At the trial, Collier testified that he had "no clue" Glass
had called 911 during the traffic stop.  ECF No. 50-6 at 8.

[13] Collier testified that the notes were not a police report, and
he prepared them for his "own recollection."  *See* ECF No. 42-4
at 3.

[14] Glass alleged six causes of action:
  (1) "False Arrest and False Imprisonment" under 42 U.S.C.
      § 1983 (Collier and the County);
  (2) "Fabrication of Evidence" under 42 U.S.C. § 1983 (Collier,
      Employee X, and the County);
  (3) "Bad Faith Concealment of Exculpatory Evidence" under 42
      U.S.C. § 1983 (Davis, Ryder, Fraser, and the County);
  (4) "Failure to Implement Appropriate Policies, Customs and
      Practices" under 42 U.S.C. § 1983 (the County);
  (5) "Conspiracy to Interfere with Civil Rights" under 42
      U.S.C. § 1985 (all defendants); and
  (6) "Neglecting to Prevent Conspiratorial Wrongs" under 42
      U.S.C. § 1986 (all defendants).
ECF No. 1 at 21-35.

three, five, and six of the complaint and bifurcated and stayed the claims against the County pending resolution of counts one and two against Collier and Employee X.  ECF No. 22.

On February 28, 2014, Collier moved for summary judgment. ECF No. 42.  On April 4, 2014, Glass moved to strike: (1) defense exhibit 1 (Collier's affidavit), ECF No. 47; (2) defense exhibit 6 (Thames's affidavit), ECF No. 48; and (3) defense exhibit 2 (Russell's expert report), ECF No. 49.  The same day, Glass opposed summary judgment.  ECF No. 50.  On April 17, 2014, Collier replied.  ECF No. 51.  On April 23, 2014, Collier separately opposed the motion to strike exhibit 2, ECF No. 52, and the motions to strike the affidavits, ECF No. 53.

II.  Analysis

A. Motions to Strike

1. Affidavits

Federal Rule of Civil Procedure 56(c)(4) provides that affidavits supporting a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Thus, under Rule 56(c), a court may strike portions of affidavits that contain legal or factual argument, are not based on personal knowledge, contain hearsay, or rest on conclusionary statements. *Contracts Materials Processing, Inc. v. Kataleuna GmbH*

11

*Catalysts,* 164 F. Supp. 2d 520, 527 (D. Md. 2001) (*citing Evans v. Tech. Applications & Serv. Co.,* 80 F.3d 954, 962 (4th Cir. 1996)); *Gardner v. Grp. Health Plan,* 5:09-CV-00152-BO, 2011 WL 1321403, at *3 (E.D.N.C. Apr. 4, 2011).  In resolving a motion to strike an affidavit, the Court uses "'a scalpel, not a butcher knife' to strike portions of an affidavit that do not satisfy the requirements of Rule 56[c]."  *Gardner,* 2011 WL 1321403, at *3 (*quoting Upshaw v. Ford Motor Co.,* 576 F.3d 576, 593 (6th Cir. 2009)).

    a. Thames's Affidavit

    Glass moves to strike Thames's affidavit, because he argues that it is "argumentative," that her statements are not based on "personal knowledge," and that it is "unreliable."  *See* ECF No. 48 at 2-3.  The affidavit only discusses evidence that bears on the length of the traffic stop.  *See* ECF No. 42-7.  Because the Court does not rely on the affidavit in resolving Collier's summary judgment motion,[15] the motion to strike will be denied as moot.[16]

---

[15] In the complaint, Glass does not challenge the length of the traffic stop as a separate violation of the Fourth Amendment, *see* ECF No. 1 at 21-22; *United States v. Digiovanni,* 650 F.3d 498, 506 (4th Cir. 2011), nor does he allege any "fabrications" during the stop that caused a deprivation of a liberty interest under the Fourteenth Amendment, *see infra* Section II.C.2.

[16] *See, e.g., Progressive Minerals LLC v. Rashid,* CIVA 5:07CV108, 2008 WL 4416408, at *3 (N.D.W. Va. Sept. 24, 2008); *Galvin v. Eli Lilly & Co.,* 488 F.3d 1026, 1030 (D.C. Cir. 2007).  Glass

b. Collier Affidavit

Glass moves to strike Collier's references to distances on Rutland Road, because Collier "does not testify to any personal knowledge of those distances, and he does not provide any reliable basis to believe his estimates are accurate." ECF No. 47 at 2. However, Collier's affidavit states that he "now know[s]" the referenced distances between relevant points on Rutland Road, and that the statements in the affidavit "are made from [his] personal knowledge." See ECF No. 42-2 at 1-3. Accordingly, because Collier's sworn affidavit expressly states that these distances are based on his personal knowledge, the Court will not strike Collier's references to distances.[17]

Glass also moves to strike portions of the affidavit about Collier's knowledge of the length of the stop, as reflected in the CAD records. See ECF No. 47 at 2-3. For the reasons discussed above in denying Glass's motion to strike Thames's

---

may renew his objections to this affidavit if the defendant seeks its admission at trial.

[17] See, e.g., Copiers Typewriters Calculators, Inc. v. Toshiba Corp., 576 F. Supp. 312, 316 (D. Md. 1983) (denying motion to strike affidavit "[b]ecause all the facts sworn to by [the affiant] relate to matters as to which he has sworn he has personal knowledge"); Salami v. N. Carolina Agr. & Technical State Univ., 394 F. Supp. 2d 696, 707 (M.D.N.C. 2005) aff'd, 191 F. App'x 193 (4th Cir. 2006) (denying motion to strike when the court could not "conclusively say that these observations [were] not within [the affiant's] personal knowledge").

affidavit, *see supra* Section II.A.1.a, the Court will deny this portion of the motion to strike as moot.

Finally, Glass moves to strike two photographs attached to Collier's affidavit, because Collier did not establish a "proper foundation" for the photographs, "and he makes statements without personal knowledge." ECF No. 47 at 3. In the affidavit, Collier describes what the photos depict--portions of Rutland Road--and explains their relevance to the case. *See* ECF No. 42-2 at 4. As a participant in the events of this suit, Collier has personal knowledge of--and has laid a proper foundation for the photographs by averring that they depict specific locations on--Rutland Road. *See* Fed. R. Evid. 901(b)(1) ("Testimony that an item is what it is claimed to be[]" can authenticate evidence.); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 561 (D. Md. 2007) ("Photographs have been authenticated for decades under Rule 901(b)(1) by the testimony of a witness familiar with the scene depicted in the photograph who testifies that the photograph fairly and accurately represents the scene."). Glass's motion to strike Collier's affidavit will be denied.[18]

---

[18] Glass may also renew his objections to this affidavit or the photographs, if the defendant seeks their admission at trial.

2. Expert Report

Glass moves to strike Russell's expert report on grounds that Russell is not qualified as an expert in the relevant field, his testimony and reports are not relevant to the case, and his reports are not based on reliable data.[19]  *See* ECF No. 49 at 3-9.  He also contends that Russell's report is not independent, because of his relationships with various members of Collier's family.  *See id.* at 6 n.1, 9-10.  Collier contends that Russell is amply qualified, his estimates are based on the parties' testimony, and Glass has "fail[ed] to make a showing that bias influenced any of Russell's opinions."  *See* ECF No. 52 at 3-5.

Federal Rule of Evidence 702 "provides that if 'scientific, technical, or other specialized knowledge will [help] the trier of fact to understand the evidence or to determine a fact in issue,' a qualified expert may testify thereto."  *Safeway, Inc. v. Sugarloaf Partnership, LLC*, 423 F. Supp. 2d 531, 538 (D. Md. 2006) (*quoting* Rule 702).  Russell's report and testimony may be admitted if they "concern[] (1) scientific, technical, or other specialized knowledge that (2) will aid the . . . trier of fact to understand or resolve a fact at issue."  *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999) (*citing*

---

[19] Glass also asserts that the report is "unfairly prejudicial" under Rule 403, *see* ECF No. 49 at 1, 3, but he does not explain why or how.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).

The first part of the analysis examines whether the reasoning or methodology is reliable, while the second part of the analysis determines whether the expert opinion is relevant to the facts at issue. *Bouygues Telecom, S.A. v. Tekelec*, 4:05-CV-78-FL, 2007 WL 4699239, at *1 (E.D.N.C. Jan. 25, 2007) (*citing Daubert*, 509 U.S. at 592). "Evidence supplied by experts as to legal conclusions is not admissible, nor indeed 'evidence' at all." *Safeway*, 423 F. Supp. 2d at 538 (*quoting Nutrition 21 v. United States,* 930 F.2d 867, 871 n.2 (Fed. Cir. 1991) (internal quotations omitted)).

Although the Court has a gatekeeping obligation with respect to expert opinion, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Larosa v. Pecora*, CIV.A. 1:07CV78, 2009 WL 3460101, at *2 (N.D.W. Va. Mar. 2, 2009) (*quoting Daubert,* 509 U.S. at 595 (internal quotations omitted)).

a.   Qualifications

Russell's curriculum vitae establishes that he has more than "25 years of law enforcement experience with over 20 years of experience in the field of collision investigation." ECF No.

16

51-1 at 2.  He has extensive training on accident investigations and reconstruction.  *See id.* at 3-10.  He has also been recognized as an expert in judicial systems in five states.[20] *See id.* at 2.

Glass objects that Russell's expertise is irrelevant, because there was no accident.  *See* ECF No. 49 at 4.  However, according to Glass's testimony, he only narrowly avoided an accident with Collier's SUV.  *See* ECF No. 50-1 at 16-17.  Glass has not shown why expertise in accident reconstruction would not encompass "near-misses."[21]  In his report, Russell states that the accident reconstruction field includes "expertise in calculating sight distances, travel distances at various speeds and the time it takes to cover them, human reaction time, acceleration and deceleration of vehicles, and stopping distance."  ECF No. 42-3 at 1.  Thus, the Court finds that

---

[20] Glass argues that Russell is not qualified as an expert, because he has not yet been admitted as an expert in any federal court.  *See* ECF No. 49 at 3-4.  Every expert testifies for a first time in a court.

[21] *Cf. Smithers v. C & G Custom Module Hauling*, 172 F. Supp. 2d 765, 769-70 (E.D. Va. 2000) (assuming that an expert in "accident reconstruction" would also have expertise in "momentum analysis").

Russell is sufficiently qualified to survive this motion to strike.[22]

### b. Independence

Glass also contends that the Court should strike Russell's report, because he is biased in Collier's favor by virtue of his relationships with Collier's relatives, many of whom work with him. *See* ECF No. 49 at 9-10. However, "an expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination." *See Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Engineers*, CIV.A. 3:11-0149, 2012 WL 8503238, at *1 (S.D.W. Va. May 3, 2012) (internal quotations and punctuation omitted); *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 515 (D. Md. 2012). Thus, Russell's potential bias is not a basis on which to strike his report.

### c. Relevance and Reliability

Glass does not challenge the reliability of the methodology used by Russell to reach his conclusions--such as the manner in which he makes calculations--instead, Glass challenges the relevance of the data on which Russell's calculations are based.

Russell bases his calculations on four key factual assumptions.[23] First, he assumes that Glass was 285 feet away

---

[22] Glass, of course, may further challenge at trial the adequacy of Russell's qualifications and knowledge through *voir dire* and cross-examination.

when Collier made his turn from the driveway.  *See* ECF No. 42-3 at 4.  This assumption is based on Collier's statement that he did not see Glass initially when he turned out of the driveway,[24] and the distance between the driveway and the point at which a car first becomes visible from the driveway.  *See* ECF No. 42-3 at 4.  Second, he assumes--in accordance with Glass's version of events--that Glass was about 100 feet away from Collier when Collier turned into the roadway.[25]  *See* ECF No. 42-3 at 3-4. Third, he assumes--in accordance with Collier's version of events--that Glass followed Collier closely for 50 to 75 yards after the driveway.[26]  Because all these facts are supported by

---

[23] Glass argues that Russell's data are faulty, because Barcenas--not Russell--performed the distance measurements for the report.  *See* ECF No. 49 at 9.  However, "an expert may rely on the work of others when preparing an expert report, particularly when it is the sort of work that is reasonably relied upon by experts in the relevant area of expertise."  *Pulse Med.*, 858 F. Supp. 2d at 512.  Further, the record does not support Glass's assertion that Barcenas authored the report or that Russell "admitted that he did not prepare the report himself."  *See* ECF No. 49 at 9.

[24] *See* ECF No. 42-2 at 2.

[25] Glass told Barcenas that he "was about 100 feet from the driveway when [Collier] pulled out in front of [him]."  *See* ECF Nos. 42-5 at 6.

[26] *See* ECF No. 50-2 at 30.  Glass contends--without relevant support--that this type of data is not "reasonably relied upon by experts," because it is Collier's estimate of the distance that Glass followed him.  *See* ECF No. 49 at 8-9.  However, "the asserted fallibility of an expert's assumptions affect the weight of his testimony, not its admissibility."  *Coleman v. Tyson Farms, Inc.*, 2:10-CV-403, 2011 WL 1833301, at *3 (E.D. Va.

the record, the data on which Russell relied in writing portions of the report based on these three facts are relevant to the case.

Glass's objections to Russell's conclusions from his calculations--and to Russell's failure to take other data into account--go to the weight of the report, not its admissibility, and may be challenged on cross-examination. *See Sparks v. Gilley Trucking Co., Inc.*, 992 F.2d 50, 54 (4th Cir. 1993) (objections to the manner in which expert formed his opinion--rather than on the facts on which the opinion is based--go to weight, not admissibility, of opinion) (*citing Bazemore v. Friday*, 478 U.S. 385, 400, 106 S. Ct. 3000, 3009, 92 L. Ed. 2d 315 (1986) (failure to include certain variables in a regression analysis affects the probative weight of the analysis, not its admissibility)). The Court will deny the motion to strike the portions of the report that rely on these facts.

A large portion of Russell's report, however, is based on the fourth factual assumption, which is faulty. Russell bases much of his analysis on Glass's alleged statement that he followed six to ten feet behind Collier's SUV for 100 feet after

---

Apr. 13, 2011) (internal punctuation omitted); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . .").

nearly colliding with the SUV. *See, e.g.*, ECF No. 42-3 at 2.
The record does not support Russell's assumption that Glass said
he followed Collier closely for 100 feet. *See infra* note 33.
Accordingly, the portions of the report based on Glass's alleged
statement are irrelevant and would not help the trier of fact.[27]
*See Sparks*, 992 F.2d at 53-54 ("[A] court may refuse to allow a
generally qualified expert to testify if his factual assumptions
are not supported by the evidence."). The Court will grant the
motion to strike those portions of Russell's report.

Finally, Glass also challenges Russell's conclusion that
Glass followed Collier too closely. *See* ECF No. 42-3 at 3, 6.
Because this is a conclusion about whether Glass violated the
law, the statements are inadmissible, and the Court will strike
them. *See Safeway*, 423 F. Supp. 2d at 538.

---

[27] Glass also argues that the report is not helpful under Rule
702, because it is merely "an attempt to exonerate Defendant . .
. that [he] failed to yield the right of way and unsafely
entered the roadway," which is an issue that "can be determined
by the common sense of the fact-finder." *See* ECF No. 49 at 5.
However, Russell's calculations of, *inter alia*, speed, stopping
time and distance, average perception time, and braking
distance--which are beyond the ken of most laymen--would be
helpful to a trier of fact in determining what occurred in this
case. Accordingly, those portions of the report based on facts
supported by the evidence are admissible under Rule 702. *Cf.
Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 138 F.
Supp. 2d 1088, 1098 (N.D. Ill. 2001) ("It is not the trial
court's role to decide whether an expert's opinion is correct.
The trial court is limited to determining whether expert
testimony is pertinent to an issue in the case and whether the
methodology underlying that testimony is sound." (*citing Smith*,
215 F.3d at 718) (internal citations omitted)).

B. Legal Standard for Summary Judgment[28]

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[29]  In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

---

[28] In the last five pages of his 55 page opposition to Collier's motion, Glass argues that summary judgment is "premature" because Collier has not complied with many of his discovery demands, and that the Court should strike Collier's motion.  ECF No. 50 at 50-55.  However, to the extent that Glass requests judicial relief, his requests are denied, because he has not moved to compel discovery or to strike Collier's motion.  *See* Fed. R. Civ. P. 7 ("A request for a court order must be made by motion.").  Also, Rule 56(d) requires the district court to refuse to grant summary judgment, when the non-movant "has not had the opportunity to discover information that is essential to his opposition."  *Works v. Colvin*, 519 F. App'x 176, 181-82 (4th Cir. 2013) (*quoting* Fed. R. Civ. P. 56(d)) (internal quotations omitted).  However, to obtain this relief, the nonmovant must show through affidavits that he cannot yet properly oppose a motion for summary judgment.  Rule 56(d); *Evans*, 80 F.3d at 961 (The Fourth Circuit "place[s] great weight on the Rule 56[d] affidavit.").  Because Glass has not filed the required affidavit, or made any other effort to alert the Court of the need for discovery beyond discussing it in his opposition, the Court may rule on Collier's motion.  *See Evans*, 80 F.3d at 961.

[29] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment."  Fed. R. Civ. P. 56 advisory committee's note.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [his] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

C.  Section 1983 Claims

Section 1983 provides a remedy against any person who, acting under color of law, deprives another of constitutional rights.  42 U.S.C. § 1983.  It "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (internal quotation marks and citation omitted).

1. Count One: False Arrest and Detention

The Fourth Amendment[30] prohibits unreasonable searches and seizures.  *Terry v. Ohio*, 392 U.S. 1, 8, 88 S. Ct. 1868, 20 L.

---

[30] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Ed. 2d 889 (1968).   Fourth Amendment reasonableness inquiries are fact-intensive.  *See Franklin v. Montgomery County,* DKC-05-0489, 2006 WL 2632298, at *13 (D. Md. Sept. 13, 2006).   An officer may lawfully make a traffic stop if he observes a violation of traffic laws, *Whren v. United States,* 517 U.S. 806, 812, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1996), or if he had probable cause or a reasonable suspicion--even if mistaken--to believe that a traffic violation occurred, *United States v. Williams*, 740 F.3d 308, 313 (4th Cir. 2014); *United States v. Mubdi*, 691 F.3d 334, 342 (4th Cir. 2012), *judgment vacated on other grounds by* 133 S. Ct. 2851, 186 L. Ed. 2d 902 (2013).   An officer's subjective motive for the traffic stop is irrelevant to its legality if, objectively, he had reasonable suspicion to make the stop.   *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996); *Digiovanni,* 650 F.3d at 506. Reasonable suspicion requires "specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief" that a violation of the law has occurred.  *See United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) (internal quotations omitted).

Section 21-310(a) of the Maryland Transportation Code provides that "[t]he driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the other vehicle and of the

traffic on and the condition of the highway." The statute does not define what it means to follow a vehicle "more closely than is reasonable and prudent;" instead, this determination "depends upon the circumstances of each case." *See Sieland v. Gallo*, 194 Md. 282, 287, 71 A.2d 45, 47 (1950). The drivers of the front and rear cars must both exercise ordinary care to avoid a collision, "and what precautions the driver of the rear car must take to avoid colliding with a car which stops or slows up in front of him, cannot be formulated in any precise rule." *Brehm v. Lorenz*, 206 Md. 500, 505, 112 A.2d 475, 478 (1955).

Viewed in the light most favorable to Glass, there is a genuine dispute of material fact about whether Collier reasonably suspected that Glass violated the traffic laws by following him too closely.[31] In Glass's version of events, Collier failed to yield to Glass and abruptly cut him off as he turned right out of the pediatrician's office's driveway. *See* ECF Nos. 50-1 at 8, 10-11; 50-3 at 6. Glass had to slam on his brakes to avoid hitting Collier. *See* ECF No. 50-1 at 16-17. He also blew his horn to alert Collier that there was a car behind the SUV. *See id.* at 6, 19. A jury could reasonably conclude that no reasonable officer would believe that Glass violated

---

[31] In his motion, Collier does not contend that he had reasonable suspicion to stop Glass because he reasonably believed Glass violated the traffic laws by blowing his horn. *See, e.g.*, ECF No. 42-1 at 11.

§ 21-310 by coming close to Collier's vehicle after Collier had abruptly cut off Glass and almost caused an accident.[32]  This conclusion would be strengthened by Glass's assertion that Collier yelled at Glass during the traffic stop for blowing his horn--not for following too closely--and Collier's acknowledgement that he saw Glass's car--albeit "way back"-- before he fully turned out of the driveway. *See id.* at 30.

Collier contends that the Court should accept several facts as "undisputed" from his version of events--such as Glass intentionally followed Collier closely for a significant

---

[32] Collier cites *Mubdi*, 691 F.3d at 342, to support his contention that--even if he was mistaken and Glass was justified in bringing his car "in close proximity" to the SUV--his mistake was reasonable. *See* ECF No. 42-1 at 12-13.  In *Mubdi*, the defendant challenged the district court's finding that officers reasonably suspected that he was following a truck too closely, in violation of North Carolina law. *See* 691 F.3d at 342. Viewing the facts *in the light most favorable to the government*, the Fourth Circuit noted that--even if officers were mistaken about *Mubdi's* distance from the truck or whether he was legally closing in on the truck to pass it--the mistake was reasonable under the circumstances. *See id*. Here, viewing the facts *in the light most favorable to Glass*, a reasonable jury could find that if Collier was mistaken about why Glass was following him so closely, that mistake was unreasonable.  By Collier's admission, he saw Glass's car before he had fully turned out of the driveway, but he continued to turn. *See* ECF No. 50-2 at 21-24.  A jury could find that it would be unreasonable for Collier to believe that Glass was close to him for any reason other than that Collier had cut him off, and it was unreasonable for Collier to conclude that Glass had violated § 21-310. *See, e.g., McDaniel v. Arnold*, 898 F. Supp. 2d 809, 836 (D. Md. 2012) (viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the plaintiff braked because the car in front of him braked suddenly, not because he was following the car too closely, and thus officers lacked reasonable suspicion to stop the plaintiff's car).

distance and blew his horn long after Collier turned out of the driveway. *See* ECF No. 42-1 at 6.  He also contends that Russell's "expert analysis" demonstrates that Glass had ample room to brake and avoid coming close to Collier.[33]  *See id.* at 11.  However, Glass's version of events contradicts Collier's proffered evidence.  It is the province of the jury, not the Court, to weigh the credibility of witnesses and resolve conflicts in evidence.  *See Anderson*, 477 U.S. at 255; *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) ("[I]f the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe.") (internal quotations omitted).

Finally, Collier asserts that "the undisputed facts demonstrate that Glass was detained on the roadside inside his

---

[33] Collier contends that Glass has stated that he followed Collier at a distance of six to ten feet from the driveway to the right turn lane--a distance which Glass says is 125 feet and which Collier says is 190 feet.  *See* ECF No. 42-1 at 11.  He argues that--even accepting Glass's version of events that he had to slam on his brakes to avoid hitting Collier--following closely for this long was unnecessary and provided reasonable suspicion for the traffic stop.  *See id.* at 11-12.  However, Glass never states that he followed Collier closely for any distance or until they reached the turn lane.  Instead, he states that the "*closest*" he came to Collier was six to ten feet "at any point" before he could "begin to back off," which is consistent with his statement that he needed to slam on his brakes to avoid hitting the SUV.  *See* ECF Nos. 42-4 at 8, 42-5 at 22-25, 51-2 at 3-4.

vehicle for, at most, ten minutes,"[34] which he contends--without

relevant citation--is a *de minimis* "level of governmental

intrusion [with] which the Constitution cannot be concerned."[35]

*See* ECF No. 42-1 at 13-14.  However, the Fourth Amendment

requires that "*any* curtailment of a person's liberty by the

police"--no matter how brief--"be supported at least by a

reasonable and articulable suspicion that the person seized is

engaged in criminal activity."  *Reid v. Georgia*, 448 U.S. 438,

440, 100 S. Ct. 2752, 2754, 65 L. Ed. 2d 890 (1980); *see also*

*Digiovanni*, 650 F.3d at 506 ("When a police officer stops an

automobile and detains the occupants briefly, the stop amounts

to a seizure within the meaning of the Fourth Amendment.").

   Collier will be denied summary judgment on count one.

        2. Fabrication of Evidence

   In the complaint, Glass alleged that his constitutional

rights were violated "when Collier fabricated the type-written

---

[34] The length of time of the traffic stop is disputed, with Glass
asserting that it lasted as long as 30 minutes.  *See* ECF No. 50-
1 at 46.

[35] Collier correctly notes that Fourth and Eighth Amendment
excessive force claims require more than *de minimis* injury.
*See, e.g., Wilkins v. Gaddy*, 559 U.S. 34, 38, 130 S. Ct. 1175,
1178, 175 L. Ed. 2d 995 (2010) (Eighth Amendment); *Karadi v.
Jenkins*, 7 F. App'x 185, 195 (4th Cir. 2001) (Fourth Amendment).
However, those principles are inapplicable here as Collier never
used physical force on Glass.  *See* ECF No. 50 at 41.

report[36] that he used to further [Glass's] prosecution . . . ,

and when Collier gave false testimony at the trial where

Plaintiff was acquitted."[37]   *See* ECF No. 1 ¶ 100.   Collier

contends that Glass's acquittal bars relief, because "he was not

harmed in a constitutionally recognized manner."   ECF No. 42-1

at 15.   In response, Glass argues that Collier's "fabrication

and falsification caused Plaintiff to be unlawfully detained for

20 to 30 minutes or more and subjected to Defendant's bad faith

prosecution on criminal charges."   ECF No. 50 at 44.   Finally,

Collier also argues that "Collier did not use his notes to

further Glass's prosecution," because "it was Glass who

introduced Collier's notes at the traffic trial, not Collier."

*See* ECF No. 42-1 at 16.

There is a Fourteenth Amendment due process "right not to

be deprived of liberty as a result of the fabrication of

evidence by an investigating officer."   *See Washington v.*

*Wilmore,* 407 F.3d 274, 283-84 (4th Cir. 2005) (*citing Miller v.*

*Pate,* 386 U.S. 1, 7, 87 S. Ct. 785, 17 L. Ed. 2d 690 (1967)).

---

[36] He also alleges that Employee X "unlawfully gave Collier
access to Internal Affairs records of Plaintiff's complaint" to
"aid and assist Collier in fabricating" his type-written report.
ECF No. 1 ¶ 101.   Glass's opposition does not explain if or why
Employee X's alleged actions violated § 1983.

[37] Even if Collier's testimony at Glass's trial was false,
witnesses are absolutely immune from damages liability for trial
testimony.   *See Briscoe v. LaHue,* 460 U.S. 325, 326, 103 S. Ct.
1108, 1111, 75 L. Ed. 2d 96 (1983).   Thus, Collier's testimony
cannot support a claim under § 1983.   *See id.*

To show a violation of this right, Glass must prove: (1) that Collier fabricated evidence; and (2) that fabrication caused a deprivation of Glass's liberty. *See id.* at 282 (*citing Zahrey v. Coffey,* 221 F.3d 342, 349 (2d Cir. 2000)).  To meet the causation prong, the deprivation must be a "reasonably foreseeable result" of the fabrication.  *See id.* at 282-83; *White v. Wright*, 150 F. App'x 193, 199 (4th Cir. 2005).

There is a genuine dispute of material fact about whether Collier fabricated evidence through the creation of a type-written statement giving a false description of the traffic stop, because the statement allegedly[38] reflected Collier's version of events which is disputed by Glass's version of events.  *See supra* Section II.C.1.  Assuming, without deciding, that Glass was deprived of a liberty interest during the traffic stop detention or by his "bad faith prosecution," Glass has not offered evidence that this fabricated evidence caused either of the alleged deprivations.  Collier wrote the statement after he stopped Glass, so it could not have caused the detention.[39]  *See*

---

[38] Neither party has submitted the statement as evidence.

[39] Glass also contends that he was deprived of liberty during the traffic stop, because the "duration of his unlawful detention" was "increased" when Collier "took [] time to concoct a false story which he communicated to Lt. Gilmer by telephone."  *See* ECF No. 50 at 45.  Glass has not cited any support--nor has the Court found any--for his assertion that prolonging a traffic stop for a matter of minutes deprived him of a liberty interest cognizable under the due process clause.  *See McFadyen v. Duke*

ECF Nos. 42-4 at 4, 50-6 at 10-11.  Further, Collier did not

introduce the statement as evidence at Glass's trial, nor is

there any evidence that the statement contributed to Glass's

prosecution.[40]  Indeed, Glass--not Collier--introduced Collier's

type-written statement to impeach Collier's credibility during

his testimony at the trial.  *See* ECF No. 42-4 at 4, 6.

Accordingly, because there is no evidence that the type-written

---

*Univ.*, 786 F. Supp. 2d 887, 944 (M.D.N.C. 2011) *aff'd in part,
rev'd in part on other grounds sub nom. Evans v. Chalmers*, 703
F.3d 636 (4th Cir. 2012) (denying Fourteenth Amendment claim
because fabricated evidence did not result in recognized
deprivation of liberty interest such as use of the fabricated
evidence at trial or arrest); *Veney v. Ojeda*, 321 F. Supp. 2d
733, 739 (E.D. Va. 2004) (claims of constitutional violations
arising out of traffic stops are cognizable under the Fourth
Amendment, not the due process clause) (*citing Graham v. Connor*,
490 U.S. 386, 395, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989)
("[A]ll claims that law enforcement officers have used excessive
force . . . in the course of an arrest, investigatory stop, or
other 'seizure' of a free citizen should be analyzed under the
Fourth Amendment . . . ."));  *Presley v. City Of Charlottesville*,
464 F.3d 480, 491 (4th Cir. 2006).

[40] Glass opines at length about the role the statement must have
played in Collier's prosecution of him for the traffic
violation.  *See* ECF No. 50 at 26-31.  However, he proffers no
evidence that Collier used his notes to justify Glass's
prosecution to others, or that Collier had to justify the
prosecution to pursue it.  Indeed, the evidence submitted by
Glass includes a statement from a State prosecutor that her
office does not "prosecute minor traffic offenses."  ECF No. 50-
15 at 4.  Even if--as Glass conjectures--Internal Affairs
conspired with Collier to prosecute Glass, there is no evidence
the statement played a part in that "conspiracy."  *See* ECF No.
50 at 30-31.  Some of this argument might support claims that
Glass did not assert in his complaint--that Collier prosecuted
Glass without probable cause or retaliated against Glass for
complaining, *see infra* note 41--but they do not support a claim
that Collier's fabricated evidence--the typed statement--played
any role in Glass's prosecution.

statement caused any deprivation of Glass's liberty, Collier

will be granted summary judgment on count two.[41]

III. Conclusion

For the reasons stated above, Collier's motion for summary

judgment will be granted in part and denied in part, Glass's

motions to strike affidavits will be denied, and Glass's motion

to strike the defendant's expert report will be granted in part

and denied in part.


_____8/7/14_____                         _____
Date                                     William D. Quarles, Jr.
                                         United States District Judge


---

[41] In his opposition to Collier's motion, Glass appears to assert
claims that Collier suppressed exculpatory evidence--his
knowledge of Glass's innocence--in violation of his *Brady*
duties, unlawfully prosecuted him on less than probable cause,
and retaliated against Glass for exercising his First Amendment
rights.  *See* ECF No. 50 at 39-47.  Regardless of the merit of
these claims, Glass did not assert them in his complaint, and
thus they are not properly before the Court.  *See Wahi v.
Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir.
2009) ("[A] a plaintiff may not raise new claims after discovery
has begun without amending his complaint."); *Robinson v. Bowser*,
1:12CV301, 2013 WL 5655434, at *3 (M.D.N.C. Oct. 16, 2013)
(Requirement of notice pleading bars plaintiffs from "rais[ing]
a new argument at the summary judgment stage, the basis of which
was not evident from the Complaint").